United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 23, 2005**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

No. 04-60774

COOPER TIRE & RUBBER CO.,

Plaintiff-Appellant,

versus

JOHN BOOTH FARESE; FARESE, FARESE & FARESE PROFESSIONAL
ASSOCIATION; JOHN DOES A-A; CLYDE TAB TURNER; TURNER &
ASSOCIATES P.A.; BRUCE R. KASTER; BRUCE KASTER, P.A.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Mississippi

Before HIGGINBOTHAM, BARKSDALE, and CLEMENT, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

For this diversity action to which Mississippi law applies, Cooper Tire & Rubber Co. contests the summary judgment awarded John Booth Farese, Bruce Kaster, and their law firms against Cooper Tire's claims for tortious interference with contract and business relations and for civil conspiracy. Cooper Tire alleges: Cathy Barnett, upon ending her employment at Cooper Tire, signed a separation agreement that contained a non-disparagement clause; nevertheless, she executed an affidavit, prepared with Farese, containing false and disparaging statements about Cooper Tire; despite knowledge of the separation agreement, Farese provided

Barnett's affidavit to another attorney, who provided it to Kaster, for use in pending litigation in Arkansas against Cooper Tire; despite knowledge of the separation agreement, Kaster leaked the affidavit to the media; as a result, Cooper Tire sustained extremely substantial losses to its stock value; and Kaster paid Farese $50,000 after the Arkansas litigation was settled. The district court erred in holding that, as a matter of law, the separation agreement is void for illegality and unconscionability; in addition, material fact issues preclude summary judgment. **VACATED and REMANDED.**

I.

This litigation springs from the affidavit by Barnett, a former Cooper Tire employee at its plant in Tupelo, Mississippi. When the affidavit was prepared with Farese, Barnett was in the process of having her employment terminated for allegedly embezzling gift certificates and college football tickets from Cooper Tire's company picnic fund. In exchange for its not filing criminal charges, Cooper Tire required Barnett to execute the separation agreement, which, *inter alia*, contained the following non-disparagement clause:

> I agree (a) not to make any public statement
> or statements to the media or, directly or
> indirectly, provide information of any kind,
> whether written or non-written, to, or
> otherwise *collaborate in any way in the taking
> of any action with, any third party concerning
> [Cooper Tire]*, without first receiving the
> written approval of [Cooper Tire]; and (b) *not*

2

> *to take action* or make any statements which could cause [Cooper Tire] any embarrassment or humiliation or *otherwise reflect negatively on* [Cooper Tire] or cause [Cooper Tire] to be held in disrepute. In the event of a violation of the terms and conditions of this Section, I agree [Cooper Tire] shall have the right to seek any injunctive, equitable and other legal relief available to it.

(Emphasis added.)

The separation agreement, which was prepared on or about 4 October 2001, advised Barnett to seek legal representation before signing it. Barnett retained Farese of Farese, Farese & Farese, P.A., in Ashland, Mississippi. During their initial meeting on 12 October 2001, Barnett informed Farese that she and another employee, Sheila Hall, had burned documents at the behest of Hogan Cooper, her manager at Cooper Tire; the documents were allegedly discoverable in pending litigation in Arkansas. *See **Whitaker v. Cooper Tire & Rubber Co.***, No. 2:99CV00220 (E.D. Ark. 2002).

While Barnett was still at Farese's office, and without her knowledge, Farese telephoned Tab Turner, a products liability lawyer in Arkansas who, Farese remembered, had recently obtained a large verdict against Cooper Tire in Mississippi. The telephone conversation lasted approximately 40 minutes. Turner suggested that Farese acquire "a lot" of detailed information from Barnett.

After Farese had talked with Turner, he drafted an affidavit for Barnett, containing her document-burning statements. She

3

executed it that day. Almost immediately after it was executed, Farese telephoned Turner and read the affidavit to him.

A few days later (16 October), Cooper Tire emailed to Farese its proposed separation agreement (prepared initially on or about 4 October). Among changes proposed by Farese, he made the following to its non-disparagement clause, in order to: (1) shift the separation agreement's effective date from 4 to 31 October; and (2) make the clause prospective, by inserting "hereafter" before its operative language. Farese emailed the revised separation agreement to Cooper Tire on 18 October.

Almost immediately after emailing his proposed revisions to Cooper Tire, and without Barnett's knowledge, Farese faxed her affidavit to Tab Turner; the cover sheet stated "Tab (a/k/a Lucky Dog): attached is a copy of the affidavit". Prior to this email, Farese had never addressed Turner as "Lucky Dog". (As developed in subsequent discovery, Farese believed that, had he provided the affidavit to Turner *after* Barnett signed the separation agreement, "we would have breached the [separation] agreement".)

Cooper Tire rejected Farese's proposed changes to the non-disparagement clause and the separation agreement's effective date, but did acquiesce in a number of other changes. Executed by Barnett on 23 October 2001, the separation agreement states, *inter alia*: "I hereby voluntarily resign from employment at [Cooper Tire] *effective October 4, 2001 ....*"; "This Agreement does not

4

become effective or enforceable until seven (7) days from the date on which I execute this Agreement (the 'Effective Date')"; and, at the bottom of the final page, "*Effective Date*: October 4, 2001". (Emphasis added.)

On 22 October 2001 (the day before Barnett executed the separation agreement), Turner emailed Kaster and Paul Byrd, plaintiffs' counsel in the Arkansas *Whitaker* action, to inform them of the existence of Barnett's affidavit, but did not disclose her identity, stating: "She is not yet ready to come forward due to a pending employment problem, but is very concerned about what she has done". On the other hand, Turner did provide Kaster and Byrd with a general overview of the affidavit's contents and ended by stating:

> I thought you should know about this so you can ask some questions to set the situation up. I would suggest that you be VERY careful about how you do this so as not to tip anyone off about what you might know.

Subsequent to this email, Byrd and his partner, James Swindoll, telephoned Turner repeatedly, asking whether the affiant was ready to come forward. By a 5 March 2002 email, Turner disclosed Barnett's identity to Byrd. Swindoll soon obtained a copy of the affidavit from Turner and provided it to Kaster.

The week after obtaining the affidavit, Byrd met with Farese at his law office in Ashland, Mississippi, where they discussed Barnett, her affidavit, and what Farese knew about Sheila Hall (as

5

noted, she is identified in Barnett's affidavit as having burned documents with Barnett). At his deposition in this action, Byrd testified that Farese informed him he would have to subpoena Barnett if he wanted to depose her. (Cooper Tire asserts Farese did this in order to "get around the language of the [separation] [a]greement".)

Cooper Tire learned from Kaster of the affidavit's existence during a 13 March 2002 hearing in the **Whitaker** litigation. Kaster initially resisted Cooper Tire's requests to reveal Barnett's name and for a copy of the affidavit. The district court in Arkansas reviewed the affidavit *in camera* and, in mid-April 2002, ordered Kaster to produce it to Cooper Tire.

On 11 April 2002, the **Whitaker** plaintiffs noticed Barnett's deposition for 23 April. The record does not reflect whether she was subpoenaed. Byrd testified in his deposition in the instant action that he did so; but, he changed his testimony on the deposition errata sheet, stating he could not remember whether he had. Farese never determined the validity of the subpoena (assuming Barnett was subpoenaed); nor, prior to Barnett's deposition being noticed, did he tell her that he had been in contact with the **Whitaker** plaintiffs' counsel.

By a faxed 22 April 2002 letter, Farese notified Greg Meyers, Cooper Tire's counsel, of Barnett's deposition, set for 23 April. Farese asked if Meyers believed the separation agreement prevented

Barnett's testifying; advised Barnett had done nothing since the execution of the separation agreement to violate it; and claimed the *separation agreement became effective 31 October 2001*.

By a faxed 23 April letter, Meyers responded that the separation agreement did not prevent Barnett from being deposed pursuant to a valid federal court subpoena. Meyers took exception, however, to Farese's assertion that Barnett had done nothing since the execution of the separation agreement that would violate its terms. Meyers asserted: the separation agreement stated the *effective date was 4 October 2001*; the affidavit was in violation of the agreement; and if Barnett had executed the affidavit *prior* to executing the agreement, then it was bad faith not to disclose this to Cooper Tire.

By a faxed 24 April letter, Farese replied to Meyers: "You are *correct* about the effective date of the agreement; it *was October 4, 2001*". (Emphasis added.) He stated, however, that the separation agreement was silent regarding any *disclosures* made prior to its effective date.

Barnett was deposed on 23 and 24 April 2002. Approximately two weeks later (10 May), her affidavit was leaked to a national business television news organization, which gave the story wide coverage. The story broke that same day, with Cooper Tire's stock price dropping approximately 25% ($500 million) in the first hour of trading and closing the day down 11% ($220 million).

7

On 14 May 2002, Barnett was subpoenaed to attend a 16 May 2002 hearing in district court in Little Rock, Arkansas, in the **Whitaker** litigation.  (Farese held a 13 minute telephone conversation with the **Whitaker** counsel the morning the subpoena was sent to Barnett; however, neither party to that conversation recalls its subject matter.)  At the hearing, and in a subsequent deposition, Barnett testified that she had not wanted to attend the hearing.  Despite her not wanting to do so and her living in another state, over 100 miles from the courthouse in Arkansas, Farese made no effort to quash the subpoena.  *See* FED. R. CIV. P. 45(c)(3)(A)(ii) ("On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it requires a person who is not a party or an officer of a party to travel to a place *more than 100 miles from the place where that person resides ....*") (emphasis added).

The hearing concerned the **Whitaker** plaintiffs' sanctions motion for Cooper Tire's alleged spoliation of evidence.  At the hearing, and contrary to her affidavit, Barnett testified that she had *not* been instructed by Hogan Cooper or anyone else at Cooper Tire to burn documents.  She testified that, instead, she was afraid of being blamed for the failure to remain current with Cooper Tire's document retention policy and of adverse consequences if anyone found out.  When Cooper Tire attempted to question Barnett about the circumstances surrounding its terminating her employment, the **Whitaker** plaintiffs objected, asserting the

8

questions were violative of the separation agreement. As a result, the court subsequently struck Barnett's entire testimony because the defendants (including Cooper Tire) had been prevented thereby from properly cross-examining her. At the end of the two-day hearing, which included testimony by Sheila Hall and Hogan Cooper, the court found there was no credible evidence that anyone at Cooper Tire instructed Barnett or Hall to burn documents. The *Whitaker* action subsequently settled on 31 July 2002 for an undisclosed amount.

Post-settlement, the *Whitaker* plaintiffs' counsel sent Farese a check for $50,000. In a subsequent affidavit, Kaster stated it was intended as a gift. After receiving the check, Farese telephoned Barnett and offered her $25,000, without disclosing the amount received. Per Barnett's instructions, Farese made the check payable to Barnett's father, in order to hide the proceeds from Barnett's husband, who was still employed by Cooper Tire. On his federal income tax return, Farese listed his $25,000 as "income". When deposed in the instant action, Barnett invoked her Fifth Amendment right against self-incrimination when asked how she treated her $25,000 for income tax purposes.

On 31 December 2002, Cooper Tire filed this action against Farese and his law firm, claiming tortious interference with its contract with Barnett and tortious interference with its business relations. After obtaining additional information, Cooper Tire

added Turner, Kaster, and their law firms as defendants, as well as a civil conspiracy claim. The district court bifurcated trial on liability and damages.

Cooper Tire's claims against Turner and his firm were dismissed for lack of personal jurisdiction, the dismissal being certified under Federal Rule of Civil Procedure 54(b) as a partial final judgment. Cooper Tire's appeal from that partial judgment was dismissed voluntarily after a settlement with Turner.

Farese answered and counterclaimed for abuse of process. The counterclaim was dismissed for failure to state a claim upon which relief could be granted.

On 9 September 2003, instead of filing an answer, Kaster moved to dismiss for failure to state a claim. Simultaneously, he moved to stay discovery, joined later by Farese, pending disposition of the motion to dismiss. On 20 November 2003, the district court, *inter alia*, stayed discovery for 90 days. On 12 December 2003, it stayed all scheduled depositions for 90 days, but allowed written discovery during that period; the discovery deadline was vacated and never reset.

On 30 January 2004, Farese moved for summary judgment. Pursuant to Rule 56(f), Cooper Tire moved to stay Farese's motion pending completion of discovery; Cooper Tire described in the requisite Rule 56(f) affidavit the numerous outstanding discovery

disputes preventing its responding to Farese's motion. *See* FED. R.
CIV. P. 56(f).

The district court did not rule on the motion until June,
almost four months later. In the interim, on 13 February 2004,
Cooper Tire submitted an additional Rule 56(f) affidavit addressing
additional disputes that had arisen during discovery, most notably
Kaster's numerous claims of privilege and Cooper Tire's outstanding
motions to compel.

Shortly before expiration of the discovery stay on 18 February
2004, Kaster, joined by Farese, moved to extend it. The district
court granted the motion on 1 March 2004, with the stay being
extended an additional 90 days, or until a ruling on Kaster's
motion to dismiss, whichever occurred first. The order, however,
allowed Cooper Tire to conduct any scheduled depositions in March
and April 2004.

In June 2004, the district court denied Cooper Tire's Rule
56(f) motion, ruling that it "had ample time to conduct discovery".
***Cooper Tire & Rubber Co. v. Farese***, No. 3:02CV210-P-A (N.D. Miss.
3 June 2004) (unpublished order). Subsequently, Kaster's motion to
dismiss was denied. Kaster answered Cooper Tire's complaint, and,
shortly thereafter, filed a summary judgment motion similar to his
motion to dismiss.

On 17 August 2004, without additional discovery being
conducted, the district court awarded summary judgment to Farese

and Kaster and their firms.  The court held:  (1) the separation agreement was ambiguous as to the effective date; (2) this ambiguity was caused by Cooper Tire's "*draft[ing] the [final] version of the [separation] [a]greement in direct response to somehow discovering the existence of the Barnett affidavit*"; (3) under Mississippi law, non-disparagement agreements are void *per se* for illegality; (4) under Mississippi law, the separation agreement was unconscionable; and (5) because the separation agreement was invalid, Cooper Tire's claims failed as a matter of law.  ***Cooper Tire & Rubber Co. v. Farese***, No. 3:02CV210-P-A, slip op. at 4-10 (N.D. Miss. 17 August 2004) (emphasis added) (***Farese***).

II.

A summary judgment is reviewed *de novo*, applying the same standard as the district court.  *E.g.*, ***Ford Motor Co. v. Tex. Dep't of Transp.***, 264 F.3d 493, 498 (5th Cir. 2001).  Such judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law".  FED. R. CIV. P. 56(c).  "We construe all facts and inferences in the light most favorable to the nonmoving party when reviewing ... [a] summary judgment." ***Murray v. Earle***, 405 F.3d 278, 284 (5th Cir. 2005) (citation omitted).

12

"An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citation omitted). "A fact issue is material if its resolution could affect the outcome of the action." *Thompson v. Goetzmann*, 337 F.3d 489, 502 (5th Cir. 2003) (citation omitted).

Cooper Tire contends the district court: (1) abused its discretion in denying the Rule 56(f) motion; (2) made improper factual findings on summary judgment regarding material fact issues; and (3) erred in concluding the separation agreement's non-disparagement clause was void for illegality and unconscionability under Mississippi law. (Because the summary judgment is vacated, it is not necessary to reach the Rule 56(f) issue.)

A.

As an affirmative defense, Kaster raises an agreement between Cooper Tire and the *Whitaker* plaintiffs' attorneys, reached during settlement negotiations for that action and which was described on the record at a hearing in district court in Arkansas regarding those negotiations. Because of that agreement, Kaster asserts accord and satisfaction for any claims arising out of the use of Barnett's affidavit or anything else stemming from the *Whitaker* action.

The agreement states: "Neither side will assert *sanctions* and/or *ethical complaints or allegations* against anyone arising out

13

of [the *Whitaker*] case ...."  (Emphasis added.)  In court, Kaster characterized the agreement as follows:

> We've ... agreed, *in accordance with the ethical guidelines*, [that] neither side at this point perceives any *unethical violations or misconduct by the other*, and so we agreed *we will not assert any type of sanctions motions or proceedings or any type of ethical complaints or allegations*, one side against the other.

(Emphasis added.)  Here, he relies on his verbal characterization.  Needless to say, the written agreement, *not* Kaster's characterization, controls.

Kaster raised this defense in his answer to Cooper Tire's complaint and in his summary judgment motion.  Because the district court found the separation agreement void on other grounds, it did not reach this issue.

Contrary to Kaster's contention, and for purposes of the instant action, the agreement precludes only criminal and civil proceedings "between Cooper and Cathy Barnett ...."  The agreement is silent regarding such proceedings against Farese, Kaster, or their firms.  Pursuant to its plain language, this agreement pertains only to "sanctions and/or ethical complaints or allegations ... arising out of" the *Whitaker* action. Restated, it does not cover the intentional torts claimed here.  Kaster's defense fails as a matter of law.

The district court made several rulings concerning the separation agreement's terms. Two rulings are critical to this appeal.

1.

First, it held the agreement's effective date ambiguous. As discussed, the separation agreement, prepared initially by Cooper Tire on or about 4 October 2001, states: Barnett resigned effective "October 4, 2001"; "[t]his Agreement does not become effective or enforceable until seven (7) days from the date on which I [Cathy Barnett] execute this Agreement"; and, at the bottom of the final page, the effective date is given as 4 October 2001. The agreement was not signed by Barnett, however, until 23 October 2001.

Therefore, whether it became enforceable seven days after 4 October (11 October) or 23 October (30 October) is ambiguous. If it became effective on 11 October, Barnett's 12 October affidavit was covered by its terms. Because the *existence* of contractual ambiguity is an issue of law, *see*, *e.g.*, **Miss. Power Co. v. N.L.R.B.**, 284 F.3d 605, 619 n.39 (5th Cir. 2002), the district court did not err in this ruling.

2.

The district court erred, however, in ruling that Cooper Tire backdated the separation agreement in order to cover Barnett's

affidavit. The court stated: "it is not a *stretch to infer* that Cooper Tire more likely than not drafted the second version of the [separation] [a]greement in direct response to somehow discovering the existence of the Barnett affidavit". ***Farese***, slip op. at 5 (emphasis added). As noted, however, and as the district court acknowledged in its opinion, a court is to make all reasonable inferences *in favor* of the nonmovant in ruling on a summary judgment motion. In this instance, the district court improperly made a critical inference *against* Cooper Tire, the nonmovant.

Moreover, this inference is unsupported by the record. (Indeed, *no appellee* contends the ruling is correct.) The record reflects: the 4 October 2001 effective date was in the original version of the agreement; Farese attempted to change the effective date to 31 October 2001, but that change was rejected by Cooper Tire; and Cooper Tire did not learn that Barnett was the source of the affidavit until April 2002, when the district court in Arkansas compelled its production. Additionally, communications between Turner and counsel for the ***Whitaker*** plaintiffs show they wanted to keep secret until the most opportune time the affiant's identity and the affidavit's contents.

Accordingly, Farese and Kaster contend that, even if the district court's ruling on this point is reversed, summary judgment is still appropriate because contractual ambiguities should be resolved against the drafter (Cooper Tire). (The only authority

16

cited for this proposition is a Mississippi Supreme Court dissenting opinion concerning a deed of trust. *See* **Shutze v. Credithrift of Am., Inc.**, 607 So. 2d 55, 72 (Miss. 1992) (Lee, J., dissenting).) This is a misstatement of Mississippi law.

The Mississippi Supreme Court has held: "where a contract is ambiguous and uncertain, questions of fact are presented which are to be resolved by the trier of facts, [therefore,] the granting of summary judgment is inappropriate". **Shelton v. Am. Ins. Co.**, 507 So. 2d 894, 896 (Miss. 1987) (citing **Dennis v. Searle**, 457 So. 2d 941, 945 (Miss. 1984)). Accordingly, the separation agreement's effective date is a fact question to be decided by the trier of fact at trial.

C.

The district court held that, as a matter of law, and regardless of whether Barnett's affidavit was covered by the separation agreement, that agreement was both illegal and unconscionable. Each ruling is erroneous.

1.

Whether a contract clause is unenforceable on grounds of illegality or public policy is a question of law. *See*, *e.g.*, **MacPhail v. Oceaneering Int'l, Inc.**, 302 F.3d 274, 278 (5th Cir. 2002), *cert. denied*, 537 U.S. 1110 (2003). In ruling, the district court noted the following Mississippi Supreme Court precedent:

> There is no doubt that the courts have the
> duty and the power to declare void and

17

> unenforceable contracts made in violation of law or in contravention of the public policy of the state. This Court has exercised this power in several classes of illegal contracts, including ... when the principal purpose of the contract directly furnishes aid and protection to an illegal enterprise ....

*Smith v. Simon*, 224 So. 2d 565, 566 (Miss. 1969) (citation omitted). The district court held the separation agreement aids and protects an illegal enterprise because it "would discourage employees from informing the authorities of alleged illegal actions committed by their employers and would enable unscrupulous employers to cover up illegal acts". *Farese*, slip op. at 7.

This reasoning is flawed in several respects. First, while the district court stated correctly that illegal contracts are unenforceable in Mississippi, it cited no Mississippi statutes or case law declaring non-disparagement clauses illegal. Quoting *Martin v. Estate of W.W. Martin*, 599 So. 2d 966, 968 (Miss. 1992), the district court stated that the Mississippi Supreme Court "know[s] of no talismanic test whether a contract offends public policy". *Farese*, slip op. at 7. Two years after *Martin*, however, the Mississippi Supreme Court, in refusing to invalidate a contract clause on public policy grounds, held:

> The power to invalidate contracts or agreements on the ground that they violate public policy is far reaching and easily abused, and this court is committed to the doctrine that the public policy of the state must be found in its constitution and statutes, 'and when they have not directly spoken, then [it must be found] in the

18

> decisions of the courts and the constant
> practice of the government officials.'

*Heritage Cablevision v. New Albany Elec. Power Sys.*, 646 So. 2d 1305, 1313 (Miss. 1994) (quoting *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 340 (1897)); *see also Orrell v. Bay Mfg. Co.*, 36 So. 561, 564 (Miss. 1904). Appellees do not cite any statute, constitutional provision, case law, or practice by Mississippi government officials that supports non-disparagement clauses being illegal *per se*.

Second, simply because a contract can *possibly* result in some unlawful end, it does not follow that courts should automatically withhold enforcement of the contract. *See Martin*, 599 So. 2d at 969. As the *Martin* court held: "Where the contract on its face is without taint, we will not necessarily withhold enforcement because some unlawful end is thereby made possible". *Id.* That court noted it had "enforced fire and property loss insurance policies though the insured premises had been used as a house of prostitution ... [and] a lease agreement though the demised premises ha[d] been used as a restaurant that regularly sold to its customers (then) illegal intoxicating liquors". *Id.* (citations omitted). The mere possibility that an employer *could* use a non-disparagement clause to hide illegal activity is, therefore, insufficient to void the clause on grounds of public policy.

19

Finally, the district court's concern that these clauses will discourage employees from disclosing their employers' illegal activities is addressed by Mississippi law. Mississippi recognizes an exception to the employment-at-will doctrine, which allows employees to sue for wrongful discharge if they are "terminated because of (1) refusal to participate in illegal activity or (2) reporting the illegal activity of [their] employer to the employer or anyone else". *Harris v. Miss. Valley State Univ.*, 873 So. 2d 970, 986 (Miss. 2004) (citation omitted). Arguably, it would be against public policy for an employer to sue a former employee for violating a non-disparagement clause by disclosing the employer's illegal activities. In any event, as conceded by Cooper Tire's counsel in his 23 April 2003 response-letter to Farese, the separation agreement could not prevent Barnett from testifying in court or at a deposition pursuant to a valid subpoena.

It goes without saying that non-disparagement clauses are common in situations where two parties terminate their employment relationship by contract. *See Equal Employment Opportunity Comm'n v. Severn Trent Servs., Inc.*, 358 F.3d 438, 440 (7th Cir. 2004) ("Such private gag orders appear to be fairly common."). They are intended to prevent a disgruntled former employee from disseminating sensitive or false information in revenge for being terminated. *Id.* This action demonstrates the valid legal purpose these clauses serve.

20

2.

In addition to its void-for-illegality holding, the district court held the separation agreement's possible retroactive effective date rendered the agreement unconscionable because "Barnett had no meaningful choice in entering the [separation] [a]greement since her reputation was on the line for future employment, as well as Cooper Tire's apparent threats" of criminal prosecution. *Farese*, slip op. at 8-9. In so holding, the district court relied on its improper inference, discussed *supra*, that Cooper Tire employed the 4 October effective date in order to cover Barnett's affidavit.

Whether a contract or contractual provision is unconscionable is a question of law. *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir.), *cert. denied*, 540 U.S. 811 (2003). In Mississippi, unconscionability can be either substantive or procedural. *West v. West*, 891 So. 2d 203, 213 (Miss. 2004).

a.

"Procedural unconscionability goes to the formation of the contract." *Id.* (citation omitted). Such unconscionability generally requires showing lack of either knowledge or voluntariness. *Norwest Fin. Miss., Inc. v. McDonald*, 905 So. 2d 1187, 2005 WL 67487, at *4 (Miss. 2005).

In negotiating the separation agreement, Barnett was represented by counsel. (Indeed, the agreement advised Barnett to

21

obtain counsel.) This weighs against procedural unconscionability.

*Id.* Moreover, as stated above, the district court relied on its improper inference that Cooper Tire utilized the 4 October effective date in order to cover Barnett's affidavit. Considering this factor, along with her representation by Farese during the negotiations, and, as discussed *infra*, the favorable terms of the agreement to Barnett, Barnett lacked neither knowledge nor voluntariness in entering the agreement. There was no procedural unconscionability.

b.

Likewise, the separation agreement was not substantively unconscionable. "Substantive unconscionability occurs when the terms of the agreement are so one-sided that no one in his right mind would agree to its terms." *West*, 891 So. 2d at 213 (citation omitted).

Through Farese's negotiations, Barnett received numerous concessions: (1) her indebtedness for the alleged embezzlement was reduced from $3,000 to $1,000; (2) Cooper Tire would not press criminal charges; (3) it would not oppose her application for unemployment benefits; (4) it agreed to language it would use if a future employer requested a reference for Barnett; and (5) her husband's employment would not be affected by her resignation or actions.

22

Considering these substantial changes favorable to Barnett, the terms of the agreement are not "so one-sided that no one in his right mind would agree to its terms". *Id.* The separation agreement, including its possibly having a retroactive effective date, is not substantively unconscionable.

D.

Cooper Tire claims tortious interference with contract and business relations, and civil conspiracy. Pursuant to Mississippi law, *tortious interference with business relations* requires showing: "(1) the acts were intentional and willful; (2) the acts were calculated to cause damage to the plaintiffs in their lawful business; (3) the acts were done with the unlawful purpose of causing damage and loss without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) actual loss and damage resulted". *PDN, Inc. v. Loring*, 843 So. 2d 685, 688 (Miss. 2003). In addition to the above elements, *tortious interference with contract* includes malicious interference with a valid contract. *Levens v. Campbell*, 733 So. 2d 753, 759-61 (Miss. 1999). *Civil conspiracy* requires showing: "(1) two or more persons or corporations; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result". *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004).

As the nonmovant, Cooper Tire provided the following evidence: Farese was aware that Cooper Tire required a separation agreement with Barnett; Farese drafted an affidavit containing disparaging false information concerning Cooper Tire; Farese was aware that, if the separation agreement was then in effect, the affidavit would violate it; before Farese drafted the affidavit, he spoke to Turner; as soon as the affidavit was executed, Farese forwarded it to Turner; Turner disclosed the existence of the affidavit to the *Whitaker* plaintiffs' counsel (which included Kaster) and eventually provided them with a copy; Kaster released the affidavit to the media during the *Whitaker* pre-trial mediation; Cooper Tire's market capitalization dropped $220 million the next day; Cooper Tire settled the case shortly thereafter; and the *Whitaker* plaintiffs' counsel paid Farese $50,000, who in turn paid Barnett $25,000.

Moreover, Farese provided the affidavit to a lawyer who had litigated previously with Cooper Tire, and Farese did not disclose to Barnett that she was not required to attend the hearing at the Arkansas district court. The record contains evidence of telephone calls between Farese, Turner, and Kaster, before and after the dissemination of the affidavit to the media. It can be inferred that these conversations included discussions about Barnett and the separation agreement.

Furthermore, Cooper Tire was not allowed to complete discovery, including pending motions to compel the disclosure of

24

information claimed privileged by Kaster.  Discovery remains to be completed.

Finally, Cooper Tire's claims turn in large part on proving Farese and Kaster's motives and intent.  These types of determinations, which involve the summary judgment movants' state of mind, are particularly ill-suited for summary judgment.  ***Int'l Shortstop Inc. v. Rally's, Inc.***, 939 F.2d 1257, 1265 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992).  In short, genuine issues of material fact preclude summary judgment.

### III.

For the foregoing reasons, the summary judgment in favor of Farese, Kaster, and their firms is **VACATED**; and this matter is **REMANDED** for further proceedings consistent with this opinion.

*VACATED; REMANDED*